578 A.2d 1102 (1990)
In the Matter of Willard C. McBRIDE, Respondent.
No. 88-1563.
District of Columbia Court of Appeals.
Argued June 6, 1990.
Decided July 18, 1990.
Wallace E. Shipp, Jr., Deputy Bar Counsel, Columbia, Md., with whom Thomas E. Flynn, Bar Counsel, was on the brief, for the Bd. on Professional Responsibility.
Joseph M. Jones, Washington, D.C., for respondent.
Before ROGERS, Chief Judge, and NEWMAN and TERRY, Associate Judges.
PER CURIAM:
We are called upon to consider a Report and Recommendation of the Board on Professional Responsibility that respondent be disbarred from the practice of law. The Board found that respondent was convicted in the United States District Court for the District of Columbia of one count of aiding and abetting a client to commit passport fraud in violation of 18 U.S.C. § 1028(a)(4) (1988). The Board also concluded that this offense involves moral turpitude, thus requiring disbarment pursuant to D.C.Code § 11-2503(a) (1989).
We accept the Board's findings of fact as supported by substantial evidence, including a certified copy of respondent's conviction from the United States District Court for the District of Columbia. We agree *1103 with the Board's conclusion that one who aids and abets an offense that is within the purview of D.C.Code § 11-2503(a) shall be permanently disbarred pursuant to that statute. We also agree with the Board that the offense for which respondent was convicted involved moral turpitude, for the reasons set forth by the Board in its Report and Recommendation, which we attach hereto and incorporate by reference.
Accordingly, it is:
ORDERED that respondent, WILLARD C. McBRIDE, is permanently disbarred from the practice of law in the District of Columbia pursuant to D.C.Code § 11-2503(a). See In re Kerr, 424 A.2d 94 (D.C.1980) (en banc); In re Colson, 412 A.2d 1160 (D.C.1979) (en banc); In re Willcher, 447 A.2d 1198, 1200 (D.C.1982). This order shall be effective thirty days from the date of this opinion.
ROGERS, Chief Judge, concurring with whom TERRY, Associate Judge, joins:
The Board on Professional Responsibility has noted in its Report to this court that the result of our interpretation of § 11-2503(a) (1989) is "widely disparate treatment of attorneys whose conduct is within the range of comparability," contrary to the dictate of D.C.Bar Rule XI § 7(a)(3). REPORT OF THE D.C. BOARD ON PROFESSIONAL RESPONSIBILITY (REPORT) of July 28, 1989 at 22. The Board requests that the court revisit its decisions in In re Colson, 412 A.2d 1160 (D.C.1979) (en banc), and In re Kerr, 424 A.2d 94 (D.C. 1980). See REPORT at 2, 22, 24-25. Respondent's conviction as an aider and abettor, as distinct from the principal actor, presents a potentially complex issue in imposing discipline into which In re Colson forecloses any inquiry. The anomaly is pronounced since the conviction of a crime of moral turpitude does not bar admission to the Bar. In re Manville, 538 A.2d 1128 (D.C.1988) (en banc). Respondent's brief provides a persuasive argument in support of the Board's suggestion that the court revisit these issues.
Accordingly, the court is presented with an appropriate occasion to reexamine its interpretation of D.C.Code § 11-2503(a) as requiring permanent disbarment upon conviction of a crime of moral turpitude with no possibility of reinstatement, absent a presidential pardon. As a distinguished member of the D.C. Board on Professional Responsibility has reminded us, "this statute is undoubtedly a harsh one."[1] Several members of the court have indicated a willingness to reconsider our interpretation of the statute in view of the possibility of an alternative analysis. See In re Wolff, 511 A.2d 1047 (D.C.1986) (en banc); In re Kerr, supra, 424 A.2d at 100-03 (Ferren, J., dissenting).

DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

Docket No. 394-88

REPORT AND RECOMMENDATION OF BOARD ON PROFESSIONAL RESPONSIBILITY
This matter is before the Board on Professional Responsibility pursuant to an order of the District of Columbia Court of Appeals. The Court's order suspended Respondent from the practice of law as provided in D.C. Bar R. XI § 15(1), based on his guilty plea to criminal charges of aiding and abetting a client to commit passport fraud in violation of 18 U.S.C. §§ 2(a), 1028(a)(4). Over Respondent's objections and contrary arguments, the order reflected the Court's conclusion that Respondent has been found guilty of a "serious crime" within the meaning of D.C. Bar R. XI, § 15(1). The Court therefore directed this Board "to institute a formal proceeding for determination of the nature of the final discipline to be imposed, and specifically to review the elements of the crime... for the purpose of determining whether or not the crime involves moral turpitude within the meaning of D.C.Code 11-2503(a)."
*1104 The Board's review has disclosed that the essential elements of the particular crime of which Respondent stands convicted include a knowing intent to defraud. Controlling precedents of the District of Columbia Court of Appeals have firmly established that crimes whose elements include such intentional fraud are crimes involving moral turpitude per se as a matter of law, and the Board is bound by such precedents. Accordingly, it is recommended that the Court enter an order permanently disbarring Respondent from the practice of law pursuant to D.C.Code § 11-2503(a) as interpreted by the Court in In re Kerr, 424 A.2d 94 (1980) (en banc).
As a closing comment, the Board observes that the Court's most recent en banc order pursuant to D.C.Code § 11-2503(a) noted that "[s]everal members of the court would reconsider the permanent disbarment holding of this court in In re Kerr, 424 A.2d 94 (D.C.1980) (en banc)," but the Court declined to do so "because that issue has not been raised in this case." In re Peter L. Wolff, 511 A.2d 1047 (D.C.C.A.1986) (en banc) (Order imposing permanent disbarment "for the reasons stated in the Division opinion, In re Wolff, 490 A.2d 1118 (D.C.1985)"). Our closing comment sets forth some practical considerations arising out of the Board's experience under the holding in Kerr if such issue is appropriately raised in this case when it reaches the Court.[1]

I. PROCEDURES AND STANDARDS APPLICABLE TO BOARD'S DETERMINATION OF "MORAL TURPITUDE" FOR PURPOSES OF D.C. CODE § 11-2503(a)
In cases of this type, the Board is bound to follow the procedures and to apply the legal standards laid down by the Court for determining moral turpitude under D.C. Code § 11-2503(a).

A. Procedures for Determining Moral Turpitude

The Court's opinion in In re Colson, 412 A.2d 1160 (D.C.1979) set forth the applicable procedures that the Board must follow in this case. These procedures have been incorporated into Board Rules 10.1 and 10.2.
The Board must make an "initial determination as to whether the attorney's crime inherently involves moral turpitude." 412 A.2d at 1164. In such initial determination, the Board must draw "a distinction ... between offenses which manifestly involve moral turpitude by virture of their underlying elements, and those which do not." Id. Moreover, the Colson Court stressed that this initial determination is strictly a legal inquiry based "on the type of crime committed rather than on the factual context surrounding the actual commission on the offense," because disbarment of an attorney under § 11-2503(a) is "for his conviction of a crime involving moral turpitude, not for his commission of an act involving moral turpitude." Id.
Thus, the procedures mandated by the court require the Board to make a preliminary legal analysis of the elements of the particular criminal offense. If such analysis shows that the conviction, considered in light of the minimum legal elements essential to establish the criminal offense, necessarily required conduct involving moral turpitude, then the attorney's conviction stands for moral turpitude per se. Moreover, if the Board's preliminary analysis discloses moral turpitude per se, "that is the end of the [Board's] inquiry" because, as a matter of law, "the Board must recommend disbarment." 412 A.2d at 1164.
The prescribed procedures also require the Board to distinguish those cases where the Court has previously "made a final determination that a crime involves moral *1105 turpitude." As to such cases, the Board's initial determination "shall be limited to the question whether the certificate of conviction... establishes that the attorney, in fact, has been convicted" of the crime previously determined by the court to involve moral turpitude. Id. at 1165. On the other hand, in cases where "the particular crime at issue has not been considered by this court" under D.C.Code § 11-2503(a), then the moral turpitude legal issues can be addressed at an initial hearing before the Board, and only if it is concluded in "the Board's initial determination [that the conviction] does not inherently involve moral turpitude" will it "become necessary" to proceed to a "full [evidentiary] hearing" exploring the underlying factual circumstances of the attorney's conviction.
In this case, the Board has followed the procedures that are prescribed by Colson. It has also received and considered excellent briefs from Respondent and Bar Counsel on the pertinent legal issues to be addressed pursuant to those procedures.
Respondent has requested oral argument, which the Board in the exercise of its discretion has decided not to authorize. Board Rule 10.1. The Board's experience has demonstrated, and this case is no exception, that the question of moral turpitude per se typically turns on legal issues that are best addressed in briefs. Moreover, oral argument almost invariably spills over into an effort by Respondent to present factual points "in mitigation of his guilty plea and the [criminal] conduct which was outlined in the information", whereas the court has expressly declared that mitigating or explanatory evidence is "unnecessary" where, as here, the legal analysis establishes that the crime of which Respondent was convicted inherently involves moral turpitude. 412 A.2d at 1168.

B. Legal Standards for Determining Moral Turpitude

The Court's opinion in Colson recognized that "the question whether a crime inherently involves moral turpitude is very difficult" and that "the term `moral turpitude' has less than a finite definition." 412 A.2d at 1165 n. 10 and 1167. It was for this reason that the Court "set out a model to assist the Board in disposing of those cases where [an evidentiary] ... hearing is necessary" as a result of the Board's initial determination that the attorney's crime did not involve moral turpitude per se.
The legal standards of Colson are general guidelines that focus the full evidentiary hearing on such issues as whether "the act denounced by the [criminal] statute offends the generally accepted code of mankind", or whether the criminal act is one of "baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general", or whether the act is "contrary to justice, honesty, modesty or good morals." 412 A.2d at 1168. Since these guidelines for a full evidentiary hearing are general in nature, "the Board accordingly will want to err on the side of admitting evidence that goes to the moral implications of the particular respondent's acts" to determine "whether his particular offense involved moral turpitude, even if the crime cannot be said per se to do so." Id. at 1165, n. 10.
Respondent stresses the Colson language quoted above to support the contention that this case should be referred to a Hearing Committee for a full evidentiary hearing to develop all of the circumstances of the alleged criminal offense and Respondent's guilty plea. It is clear, however, that these broad and general guidelines of Colson apply only where the Board's initial determination discloses no moral turpitude per se. Such guidelines have no application in a case, such as this one, where the attorney's criminal offense has already been determined by the Court to be one involving moral turpitude.
This case is governed by the Court's decision in In re Willcher, 447 A.2d 1198 (D.C.1982), and its progeny. The attorney in Willcher "was convicted ... of unlawful solicitation of money from an indigent whom he had been appointed to represent under the CJA", a misdemeanor for which the attorney was sentenced to six months' imprisonment and fined $700. The prison sentence was suspended and probation of *1106 15 months was imposed. In rejecting the Board's conclusion that the conviction in Willcher did not involve moral turpitude, the Court quoted and adopted the rule in California:
"Although the problem of defining moral turpitude is not without difficulty, it is settled that whatever else it may mean, it includes fraud and that a crime in which an intent to defraud is an essential element is a crime involving moral turpitude."
412 A.2d at 1200, quoting Justice Traynor's opinion in In re Hallihan, 43 Cal.2d 243, 272 P.2d 768, 771 (1954), appeal after remand, 48 Cal.2d 52, 307 P.2d 1 (1957).
Although the criminal convictions in Willcher and Hallihan were concerned with "an offense involving both fraud and intentional dishonesty for personal gain", the Willcher court held that fraud alone is sufficient to constitute moral turpitude under § 11-2503(a). As stated by the court, the criminal conviction in Willcher "always [requires] a fraud on the client ... and on the judicial system, and we hold that [it]... falls squarely within the definition of an offense inherently involving moral turpitude." 447 A.2d at 1200-01.
In the wake of Willcher, both the Court and the Board have held, without deviation, that conviction of a crime which "necessarily required proof of intent to defraud ... inherently involves moral turpitude." In re Meisnere, 471 A.2d 269, 270-71 (D.C. 1984); accord, In re Anderson, 474 A.2d 145, 146 (D.C.1984). As stated in the court's most recent decision on the question:
As for Respondent's other conviction [conspiracy to defraud the United States in violation of 18 U.S.C. § 371], the court has held that statutory crimes with the element of fraudulent intent involve moral turpitude. Accordingly, there was no need for a factual determination as to the specific conduct involved in respondent's convictions for violation of 18 U.S.C. § 371.
In re Vogel, No. 88-73, Slip Op. at 1-2 (May 31, 1989).

II. LEGAL ANALYSIS OF RESPONDENT'S CONVICTION
In light of the controlling precedents discussed supra, we turn to a legal analysis of the statutory provisions defining the elements of the crime of which Respondent was convicted. The focus of this analysis is to determine whether such elements necessarily required proof of an intent to defraud.

A. Essential Elements of Respondent's Criminal Offense

Respondent's conviction was entered in the United States District Court for the District of Columbia on a plea of guilty to an information charging him with "aiding and abetting" another person in the commission of "passport fraud" in violation of 18 U.S.C. §§ 2, 1028(a)(4). The pertinent statutory provisions are as follows:
§ 2 Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
* * * * * *
§ 1028 Fraud and Related Activity in Connection with Identification Documents

(a) Whoever . . .
(4) knowingly possesses an identification document (other than one issued lawfully for the use of the possessor) or a false identification document, with the intent such document be used to defraud the United States ... shall be punished as provided in subsection (b) of this section.
Subsection (b)(3) provides that the offense defined in § 1028(a)(4) is punishable by "a fine of not more than $5000 or imprisonment for not more than one year, or both". It is therefore a misdemeanor offense, whereas the punishment for violations of certain other subsections of § 1028(a) cause them to be felonies.
It is acknowledged that respondent's conviction was under 18 U.S.C. § 2(a) for aiding and abetting a pro bono client, Ms. Patricia Shahid, in committing "passport *1107 fraud" in violation of 18 U.S.C. § 1028(a)(4). The elements of such conviction requires a legal analysis of the interplay between the aider/abetter provisions of § 2(a) of the Criminal Code and the substantive offense defined in § 1028(a)(4).
The controlling precedent is Standefer v. United States, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). As the Court observed, the Common Law dealt with "parties to a crime" in terms of "principals and accessories", and over the years, the Common Law became "riddled with `intricate' distinctions." Id. at 15, 100 S.Ct. at 2003. As part of a turn-of-the-century reform movement, Congress in 1909 enacted 18 U.S.C. § 2 to eliminate such intricate Common Law distinctions and to provide instead that all persons participating in the commission of a crime, either directly or as one who aids and abets its commission, should be tried and punished as "principals".
Thus, as originally enacted, 18 U.S.C. § 2 expressly provided that anyone who aids or abets the commission of a crime "is a principal". 447 U.S. at 18, 100 S.Ct. at 2005. In 1951, Congress changed the words "is a principal" to the words "is punishable as a principal." As the Supreme Court observed, this "change was designed to eliminate all doubt that in the case of offenses whose prohibition is directed at members of specified classes (e.g., federal employees), a person who is not himself a member of that class may nonetheless be punished as a principal if he induces a person in that class to violate the prohibition." Id.
As the Standefer Court held, a criminal trial under 18 U.S.C. § 2 imposes upon the government "the burden of proving beyond reasonable doubt that [the other person committed the alleged underlying crime]... and that petitioner aided and abetted him in that venture." Id. at 26, 100 S.Ct. at 2009. However, it is clear that 18 U.S.C. § 2 does not create a wholly independent crime, and indeed there is no penalty applicable to § 2. It simply abolishes the old Common Law intricacies of principal and accessory, and if the requirements of § 2 are satisfied, the aider and abetter is a "principal" subject to the same punishment as the other person committing the alleged underlying crime. United States v. Kegler, 724 F.2d 190 (D.C.Cir.1984).
A leading opinion in this jurisdiction is United States v. Raper, 676 F.2d 841 (D.C. Cir.1982). As the court observed, "there must be a guilty principal before a second party can be found to be an aider and abetter", but the party who aids or abets the offense "is guilty under the statute as a principal." Id. at 849. According to the Raper court, the elements of an aiding and abetting offense are the following:
"(1) the specific intent [of the alleged aider or abetter] to facilitate the commission of a crime by another; (2) guilty knowledge on the part of the accused; (3) that an offense was being committed by someone; and (4) that the accused assisted or participated in the commission of the offense."
Id. at 849 (citations omitted).
With respect to the third element listed by the Raper court, the law is clear that proof in the aiding and abetting case must establish every element of the criminal offense allegedly committed by another person. As stated by the Ninth Circuit, the jury in the aiding and abetting case must find every "essential element of the crime" allegedly committed by the other person "as a prerequisite to conviction" of the alleged aider and abetter. United States v. Short, 493 F.2d 1170, 1172 (9th Cir.1974).
It is not necessary to conviction of an aider and abetter that the other person be tried and convicted, or even that such person be identified. United States v. Provenzano, 334 F.2d 678 (3d Cir.), cert. denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). Indeed, the aider and abetter can be convicted even though the other person is acquitted, because "the fate of other participants [in their trials] is irrelevant." United States v. Sandefer, 447 U.S. 10, 20, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). However, all elements of the criminal offense allegedly committed by the other person must be established in the case against the alleged aider and abetter.
*1108 The first and second elements identified by the Raper court (specific intent and guilty knowledge) are closely related. These two elements require proof that the alleged aider and abetter had actual knowledge of the other person's conduct and intent with respect to every material element of the crime allegedly committed by such other person. For example, in a case where the alleged underlying crime was armed bank robbery, the trial court instructed the jury that the alleged aider and abetter could be found guilty without proof of his knowledge that the other person inside the bank had a gun. Since use of a gun was an essential element of the alleged underlying crime of armed robbery, this instruction was erroneous because "it is the aider and abetter's state of mind, rather than the state of mind of the principal, that determines the former's liability." United States v. Short, 493 F.2d 1170, 1172 (9th Cir.1974).
The fourth element of aiding or abetting requires proof that the accused assisted or participated in the commission of the underlying offense. The legal standard was initially formulated by Judge Learned Hand in United States v. Peoni, 100 F.2d 401 (2nd Cir.1938). The alleged aider and abetter must
". . . associate himself with the [criminal] venture . . . participate in it as something that he wishes to bring about and ... seek by his action to make it succeed."
Id. at 402. This standard for establishing the required "participation" of the alleged aider and abetter has been adopted by the Supreme Court and numerous lower federal courts. E.g., Nye and Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949); United States v. Staten, 581 F.2d 878, 887 (D.C.Cir.1978); United States v. Holder, 566 F.2d 617, 619 (8th Cir.1977). As refined by the Raper court:
"All that is necessary is to show some affirmative participation which at least encourages the principal offender to commit the offense, with all its elements, as proscribed by the statute."
676 F.2d at 850.
We turn next to the essential elements of the alleged underlying criminal offense by the "other person" who, in this case, was Respondent's client, Ms. Shahid. She allegedly violated 18 U.S.C. § 1028(a)(4), the language of which breaks down into the following elements:
(1) Ms. Shahid "knowingly possess[ed] an identification document (other than one issued lawfully for the use of the possessor)"; or

(2) Ms. Shahid "knowingly possess[ed]... a false identification document"; and
(3) Ms. Shahid had "the intent [that] such document be used to defraud the United States."
Elements (1) and (2) above are alternative requirements, i.e., Ms. Shahid knowingly possessed either a counterfeit or a false identification document. For purposes of determining whether the Respondent's aiding and abetting offense involved moral turpitude, the Board perceives no legal significance in the possibility that Ms. Shahid's alleged crime could have been predicated on either a counterfeit document or a false document.
Ms. Shahid's alleged offense required proof of her possession of either a counterfeit or false identification document. Of course, proof of possession by Ms. Shahid does not establish possession by Respondent, the alleged aider and abetter. This distinction, however, is of no avail because the courts have held that an aiding and abetting offense, when predicated on another party's underlying crime which requires as an essential element the "possession" of something, there is no need to prove that the aider and abetteor "possessed" the thing in question. This was the principal holding in the Raper case. 676 F.2d at 850. On the other hand, the government's proof must establish that the aider and abetter had guilty knowledge of the other person's "possession" of the thing in question.
As to the "intent" element in Ms. Shahid's alleged criminal offense, the statute required proof of her "intent [that] such document be used to defraud the United States", which the information identified as *1109 "passport fraud". Accordingly, Respondent's conviction established that he had the specific intent to facilitate Ms. Shahid's commission of her alleged crime requiring such intent to defraud and that Respondent further had guilty knowledge of the criminal venture. Raper, 676 F.2d at 849; see discussion supra.
To sum up, based on the essential elements of the crime involved in Respondent's conviction, the following must be accepted as true for purposes of the moral turpitude issue:
1. Ms. Shahid had possession of either a counterfeit or false identification document;
2. Ms. Shahid had the intent to use such identification document to defraud the United States by means of passport fraud;
3. Ms. Shahid therefore committed a violation of 18 U.S.C. § 1028(a)(4);
4. Respondent had the specific intent to facilitate commission of the crime by Ms. Shahid;
5. Respondent had contemporaneous guilty knowledge of the criminal offense, including all of its elements, as the crime was being committed by Ms. Shahid; and
6. Respondent knowingly assisted or participated in the commission of Ms. Shahid's criminal offense.
The Board concludes that the above elements establish that the crime of which Respondent was convicted was one involving a knowing intent to defraud. Under the controlling rule of Willcher discussed supra, Respondent's conviction was of a crime that involves moral turpitude per se.

B. Respondent's Arguments Are Legally Insufficient To Overcome The Legal Conclusion That Respondent's Crime Involved Moral Turpitude Per Se

Respondent's brief advances various arguments to support the contention that the criminal offense here in question did not involve moral turpitude per se. None of these arguments is persuasive.
1. The "Misdemeanor" and "Aider and Abetter" Arguments. Respondent's brief urges that "the Board should consider both that the violation is a misdemeanor and that Mr. McBride was charged only as an aider and abetter, not a principal." Respondent's Brief to Board at 17. As part of this same line of argument, Respondent also urges that his criminal conviction does not involve moral turpitude per se inasmuch as other criminal offenses not involving moral turpitude per se require "conduct far more harmful" [than] Respondent's crime. The Board is not persuaded by any of these arguments.
It is legally irrelevant whether the criminal conviction involves a misdemeanor or a felony. Indeed, the court's seminal decision, which established that crimes requiring proof of intentional fraud involve moral turpitude per se, was handed down in a case involving a misdemeanor. In re Willcher, 447 A.2d 1198, 1199 (D.C.1982).
Closely related to Respondent's "misdemeanor" argument is the contention that a comparison of the maximum punishment applicable to the various offenses in 18 U.S.C. § 1028 shows that Respondent's offense under subsection (a)(4) calls for the least punishment and is therefore the least culpable offense in § 1028. This argument is predicated on the further assertion that the more culpable offenses in 18 U.S.C. § 1028 do not involve moral turpitude per se and that therefore the least culpable offense in subsection (a)(4) must also be free of moral turpitude per se. This argument is a non sequitur because it assumes, without any valid basis, that Congress always proportionalizes criminal punishment based on degrees of moral turpitude involved in the criminal conduct.
The further contention that a distinction should be made between an "aider and abetter" as compared to a "principal" is also unavailing. It is contrary to the overwhelming authority that an "aider and abetter" is "a principal" under federal criminal law, and is therefore subject to the same punishment as the "other person" who was aided and abetted.
Respondent further argues that his plea bargain agreement was based on an alleged *1110 violation of 18 U.S.C. § 1028(a)(4) because government prosecutors wanted him to receive the least amount of criminal punishment provided by this statute. Respondent also notes that the sentencing judge placed him on probation with the hope that Respondent could fulfill his community service obligations by practicing law. Once again, these are facts which, if true, might be considered in mitigation or explanation of the circumstances underlying Respondent's conviction, but all such facts are legally irrelevant in the Board's initial determination of the moral turpitude issue.
Nor does it advance Respondent's cause to point to cases where no moral turpitude per se was found for criminal offenses involving conduct allegedly "far more harmful" than Respondent's conduct in this case. As noted, the Board is not concerned with an examination of all of the facts and circumstances of Respondent's conduct underlying the criminal offense. Rather, we are concerned only with the essential elements of Respondent's criminal offense as determined by a legal analysis.
Respondent's cause would be advanced if one could point to a post-Willcher decision of the court holding that a particular crime did not involve moral turpitude per se even though it did involve a knowing intent to defraud. Unfortunately, from Respondent's point of view, there is no such post-Willcher decision.
2. Respondent's "Legislative History" Argument. Respondent argues that the legislative history of 18 U.S.C. § 1028(a)(4) shows that the crucial statutory language requiring proof of "intent to defraud the United States" has such a broad meaning that it encompasses criminal conduct under "hundreds of such [federal] statutes, only a tiny fraction of which will involved moral turpitude." Respondent's Brief at 15. Once again, the Board is not persuaded. Respondent's crime is based on an information charging "passport fraud", and nothing in the legislative history indicates that this type of crime does not involve moral turpitude per se under Willcher.
Respondent relies on a passage in House Report No. 97-802 (Sept. 10, 1982), which accompanied H.R. 6946, the Bill that was enacted as 18 U.S.C. § 1028(a)(4) on December 31, 1982. The full pertinent text of this portion of the House Report is set forth below:
The fourth offense [18 U.S.C. § 1028(a)(4)] ... is knowing possession of ... a false identification document, with the intent such document be used to defraud the United States.... The Committee intends that possession with the intent to commit any offense that would be subsumed under the term "defraud the United States" would be covered. It is the view of the Committee that the intent to defraud the United States in this context is an intent to use the identification document to commit an offense against the United States, for example, an offense under 18 U.S.C. § 1001. The term "defraud the United States" is not simply a misrepresentation ... but would include use of false identification to obstruct functions of the government.
U.S.Code Cong. & Admin.News, 3519, at 3529 (Dec.1982).
The above passage makes crystal clear that the term "defraud the United States" requires something more than a "misrepresentation." The two specific examples cited in the Committee's Report are illuminating. One such example is the "use of false identification to obstruct functions of the Government." The Board can perceive no meaningful distinction that would preclude a finding of moral turpitude per se where a violation of 18 U.S.C. § 1028(a)(4) is based on a knowing intent to use false identification in obstructing the functioning of the federal government by means of passport fraud.
The other example of "intent to defraud", as set forth in the House Report, is use of a false identification document to commit an offense under 18 U.S.C. § 1001. This section of the Criminal Code defines a criminal offense with respect to any "material fact" which the defendant "knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device" in a matter *1111 before a department or agency of the federal government. If an intent to defraud the United States through a violation of 18 U.S.C. § 1001 is illustrative of the "intent to defraud" required by § 1028(a)(2), as suggested by the House Report, such legislative history provides scant support for Respondent's argument that the "intent to defraud" element in his passport fraud conviction could have been supplied by means of a violation of "hundreds" of other federal statutes, only a tiny fraction of which involve moral turpitude.
The House Report cited by Respondent also stated that the "Committee intends that the term `with the intent' have the same culpable state of mind as the term `purpose' as used in the Model Penal Code (§ 2.02)." U.S.Code Cong. & Admin.News at 3528 (Dec.1982). The Committee's Report then quoted with approval a recent Supreme Court opinion defining the word "purpose" or "purposefully" as requiring proof that the person "consciously desires" a particular result. As applied to the instant case, this would require that Respondent "consciously desired" the success of Ms. Shahid's efforts to engage in passport fraud.
Moreover, Respondent's reliance on In re Meisnere, 471 A.2d 269 (D.C.1984) is misplaced. In Meisnere, the Board concluded, and the court agreed, that the attorney's conviction on a guilty plea to an alleged violation of the general conspiracy statute, 18 U.S.C. § 371, involved a crime of moral turpitude per se. This conclusion was proper because "the information ... specifically charged conspiracy knowingly to defraud the United States by obstructing the Treasury Department in its attempt to ascertain the assets of and the taxes due from another person ... which ... necessarily required proof of intent to defraud." Id. at 270. The Board's report in Meisnere simply noted, by way of dictum, that an offense under 18 U.S.C. § 371 "does not necessarily constitute moral turpitude per se" because § 371 encompasses not only a conspiracy "to defraud the United States" but also an agreement or conspiracy to commit "any offense against the United States."
In this case, Respondent's conviction was based on an information charging passport fraud under a statute which explicitly requires proof of an intent to use a counterfeit or false identification document "to defraud the United States." When 18 U.S.C. § 1028(a)(4) is read together with the information charging passport fraud, the Board can find no legal basis for the position that Respondent's conviction did not constitute a crime involving a knowing intent to defraud.

III. SOME CLOSING COMMENT
The Board's experiences in dealing with D.C.Code § 11-2503(a) pursuant to procedures mandated by In re Colson, 412 A.2d 1160 (D.C.1979), and the holding in In re Kerr, 424 A.2d 94 (D.C.1980), have disclosed various anomalies. Perhaps a few examples might be pertinent should the court decide in this case to revisit the procedures of Colson or the holding in Kerr.
The combined effect of the permanent disbarment holding in Kerr and the related Colson procedures yield widely disparate treatment of attorneys whose misconduct is within the range of comparability. By way of example, the misconduct in In re Reback, 513 A.2d 226 (D.C.1986) (en banc), included intentional forgery of a client's signature, falsely impersonating the client before a notary (or alternatively, aiding and abetting a notary public to certify falsely that the signature of the client was placed on the document in the presence of the notary), and then submitting the fraudulent document to the Superior Court of the District of Columbia to induce judicial action. The substance of the misconduct in the Reback was similar to, and perhaps more egregious than, the misconduct involving Respondent's alleged "good Samaritan" effort to assist his client in committing passport fraud. The difference between the two cases is that the attorneys in Reback escaped all possible criminal felony charges, such as charges under D.C.Code § 22-1401 ("forgery"), § 22-1303 ("false personation before ... notaries"), § 22-1308 ("false certificate of acknowledgment"), or § 22-2514 (misdemeanor for *1112 "false statements"). In contract, Respondent in this case was not so fortunate when government prosecutors decided to prosecute him for misdemeanor of aiding and abetting passport fraud.
Other attorneys have escaped permanent disbarment under D.C.Code § 11-2503(a) even though, unlike the Reback attorneys, criminal charges were filed and a conviction obtained. For example, the evidence in In re Hutchinson, 534 A.2d 919 (D.C. 1987), disclosed that the attorney had probably committed perjury in his testimony before the S.E.C. However, he entered a guilty plea to a misdemeanor offense under the securities laws, an offense which did not involve moral turpitude, and his disciplinary sanction was suspension for one year. Had the attorney in Hutchinson been convicted of perjury, there would have been a strong likelihood of a finding of moral turpitude and permanent disbarment pursuant to D.C.Code § 11-2503(a).
Similarly, the case of In re Thompson, 538 A.2d 247 (D.C.1987), involved an attorney who faced a criminal charge of "knowingly assisting in the presentation of false statements" to the Immigration & Naturalization Service ("INS") in support of his client's application for status as a permanent resident alien. These charges could have provided a basis for a felony conviction under 18 U.S.C. § 1001 ("fraudulent statements" to U.S. agency). However, the felony charge involved in the Thompson case was ultimately dismissed for reasons not fully disclosed in the record. Once again, if the facts developed in the disciplinary proceeding had been used as a basis for a possible criminal conviction under 18 U.S.C. § 1001, the sanction could have been permanent disbarment, as compared to suspension for one year as actually imposed.
Other examples of similar anomalies have occurred, and are bound to occur in the future, as long as the court adheres to its holding in Kerr and the procedures of Colson for determining moral turpitude per se. Such anomalies are inconsistent with one of the most important provisions of Rule XI requiring comparable sanctions for comparable misconduct.
The Board recognizes, as Judge Newman has often stressed, that the root cause of these apparent anomalies can be traced to enactment to D.C.Code § 11-2503(a). For purposes of all proceedings before this Board, including this case, the Board is bound to follow the mandates of the statute as interpreted by the court in its Colson/Kerr decisions. We have endeavored to do so in this report. These comments are submitted solely because the court announced in In re Wolff, supra, that "several members of the court" are prepared to reconsider interpretation of D.C.Code § 11-2503(a) in the Kerr decision, which is action that only the court, not this Board, can take.[2]

IV. CONCLUSION
For the reasons set forth in this report, the Board recommends that the court enter an order permanently disbarring Respondent pursuant to D.C.Code § 11-2503(a).
 BOARD ON PROFESSIONAL
 RESPONSIBILITY
 By /s/ J. Randolph Wilson
 J. RANDOLPH WILSON
 Chair
All members of the Board concur in this report and recommendation except Mr. Donnenfeld who is recused and except Mr. Carter who did not participate.
Dated: July 28, 1989.
NOTES
[1] In re Herbert S. Ezrin, Bar Docket No. 97-87, Report and Recommendation of the D.C. Board on Professional Responsibility by Beatrice Rosenberg, Esq., September 14, 1987.
[1] Although the Court's consideration of the issue on permanent disbarment under D.C.Code 11-2503(a) could be delayed until a petition for reinstatement is filed after the normal five-year period for disbarment, it would appear (assuming the Court is prepared to revisit Kerr) that the issue is ripe for decision at the time of the Court's initial disbarment order. Otherwise, Respondent would be forced during the five-year period to pursue a course of action for developing clear and convincing evidence of his fitness to resume the practice of law without knowing whether such action would be wholly futile as a matter of law.
[2] The Board is aware, of course, that even if the Court determines to revisit Kerr and to conclude that disbarment under D.C.Code § 11-2503(a) calls for the normal five-year period of suspension rather than permanent disbarment, anomalies would continue to exist as long as the statute remains in effect. Thus, five years of suspension because of mandatory disbarment under the statute could continue to be far more severe than the lesser period of suspension for generally comparable misconduct evaluated only under the Code on Professional Responsibility.